120   67<br>f154  477

## CONKLING v. VILLAGE OF MACKINAW CITY.

1. COMMON-LAW DEDICATION—PLATS—PUBLIC PARK.

Where the owner of wild land plats it into village lots, reserving for a public park a tract naturally adapted to that use, and marking it as such upon the plat, and effects sales of the lots by means of pamphlets which refer to the plat, and set forth the existence of the park as an inducement to purchasers, he cannot thereafter defeat the public right because of a lack of the statutory formalities in the dedication, since the proceedings amount to a dedication at the common law.

2. SAME—ACCEPTANCE—UNINCORPORATED VILLAGE.

Under such circumstances, it is not necessary that there should be a formal acceptance of the dedication, either before or after the incorporation of the village; the use of the land by the public for the purpose designated being sufficient, especially if the villagers and the grantor make common cause in its improvement.

Appeal from Emmet; Adams, J. Submitted February 9, 1899. Decided April 25, 1899.

Bill by Clinton L. Conkling, executor of the last will and testament of Mercie A. Conkling, deceased, against the village of Mackinaw City, to quiet title to land. From a decree dismissing the bill, complainant appeals. Affirmed.

*B. T. Halstead*, for complainant.

*Pailthorp & McCabe*, for defendant.

MOORE, J.    The complainant filed a bill to quiet the title to about 20 acres of land which defendant claims is a public park.  From a decree dismissing the bill, complainant has appealed.  The accompanying plat will aid in understanding the situation:

The circuit judge filed a written opinion, from which the following is taken:

"It appears that, at an early day in the history of this part of the State, one Edgar Conkling became imbued with the idea that a large city and commercial and manufacturing metropolis would come into existence, in the natural order of things, at the point where the village of Mackinaw City now stands. He was a speculator in real estate; and, acting under this conviction, and seeing, or thinking he saw, large gains to be made in the enterprise, some time in the year 1854, or about that time, he took steps to purchase nearly all the land in the vicinity of the Straits, including the land in dispute in this case. Other parties became associated with him in the enterprise, and became owners of shares in the property. These owners, being desirous of establishing a city, to be called 'Mackinaw City,' there, on July 30, 1857, executed to said Edgar Conkling and Asbury M. Searles what is called a 'deed of trust;' the trust being that the trustees, Conkling and Searles, or their successors, 'shall at their discretion lay off the whole or any part of said premises into lots, streets, alleys, parks, and other proper arrangements for a town or city, * * * and at their discretion to sell or barter the same, or any portion thereof, in any manner, and for such consideration, as they may deem proper,' and to make and hold all necessary papers, etc., and ratifying and confirming all their acts. * * * Between this date, July 30, 1857, and September 30th of the same year, the trustees caused a survey and map of the proposed city to be made. This plat or map shows on its face a space on the north side, and next to the Straits, not laid off into blocks and lots and streets, but with marks indicating a pleasure ground, and marked, 'Old Fort Park, 20 acres,' being the ground in dispute in this case. The instrument of dedication attached to the map or plat, dated September 24, 1857, dedicates to the public use 'all the streets and avenues,' but does not mention the park. The trustees above named put forth and published a pamphlet containing this map or plat under the date of October, 1857, evidently for the information of prospective settlers and purchasers of lots at Mackinaw City, and intended to influence and induce people to locate there and purchase property. At this time, as I understand the testimony, there were no people residing at Mackinaw City, the whole tract covered by the plat being an unbroken wilderness. In this pamphlet, so published, the park is descanted upon as follows:

" 'The park now laid off embraces the grounds of the Old Fort Michilimackinac, sacred in the history of the country. These grounds, now in their natural condition, are unequaled for beauty of surface, location, scenery, soil, trees, etc., by any park in any city in this country; and when the skillful hand of the horticulturist has marked its outline, and threaded it with avenues and footpaths, pruned its trees, and carpeted its surface with green, it will present the very perfection of all that constitutes a park delightful. This park, with suitable blocks and lots for county and city buildings, market houses, schools, etc., will be duly appropriated to these uses whenever the proper authorities are prepared to select suitable sites; and lots for churches and institutions of learning and charity will be freely donated to parties contemplating early improvement. Thus the trustees propose to anticipate, by avoiding the errors of older cities, the wants of Mackinaw City in perpetuity, and free forever its citizens from taxation for any grounds required for public good.'

" The testimony taken tends to show it was the custom of Edgar Conkling, and also of Henry Conkling, who afterwards succeeded to the management of the property, to call the attention of those proposing to purchase to this park, take them to it, and point it out, and expatiate on its advantages to the people, and speak of it as an existing fact, for the public good, and in some cases justifying the large price asked for the lots by the liberality of the proprietors in giving the beautiful park, etc.

"It is claimed on the part of complainant in this case that the language above quoted from the aforesaid pamphlet shows that the trustees only made a conditional offer to dedicate the park; the condition being that the proper authorities should first ' select a suitable site.' I cannot agree with this contention. It seems to me that the trustees and proprietors not only offered and intended to give to the public at once the Old Fort Park as a place of recreation and pleasure, but also offered to give other lands—'suitable blocks and lots'—for the other purposes mentioned, as the necessity might arise from time to time; that is for 'county and city buildings, market houses, schools, etc.' As to the park, no selection of a site by anybody was necessary, as the proprietors had themselves most effectually selected and established its site and location. Consequently, the words 'select suitable sites' could not apply to the park, but only to the other purposes mentioned. I can come to no other conclusion than that the trustees and proprietors, in September and October,

1857, and for many years afterwards, offered unconditionally and presently to donate the park to the public of Mackinaw City as and for the usual purposes of a city park.   *   *   *

"As to the instrument executed by the trustees dated September 24, 1857, it is claimed on the part of complainant that it shows an intent to dedicate only the streets and avenues.   I do not understand it in that way.   It dedicates the streets and avenues, but says nothing about the park.   I cannot see how it could be said to indicate an intent to dedicate only the streets and avenues, especially if taken in connection with the pamphlet and the other acts of the proprietors.

"On the whole, I am satisfied that the trustees offered unconditionally, and so intended, to dedicate the park to. the public for park purposes.   There are many cases which hold that the making of a plat with streets and avenues and parks designated thereon, and the sale of lots by reference to the plat, constitute an irrevocable dedication to the public of such public grounds; but I am not satisfied that such is the doctrine of the Supreme Court of this State.   In this case it appears that the proprietors made a number of sales by reference to the plat, and at the same time represented the Old Fort Park as set apart for public use.   I think such sales may be proved as acts *in pais*, to prove the intent of the proprietors to make the dedication.   The said map and plat, and the dedication of the same, appear to have been executed by the trustees, Conkling and Searles, and acknowledged before John G. Douglass, a commissioner for the State of Michigan, residing in the city of Cincinnati, Ohio, under the seal of his office, and dated September 24, 1857, and were afterwards duly recorded in both Cheboygan and Emmet counties, in this State, the counties where said lands lie.   It seems that this was not, in all respects, in strict compliance with the statute in relation to town plats.   If, however, it was a sufficient compliance, then by the statute the fee of all the lands designated on such plat as laid out for streets, parks, and public grounds vested in the county, in trust for the use of the public for the purposes designated.   If the curative statute of 1850 would apply, then it would help this conclusion.   If, however, there was not a valid statutory dedication, then I think the plat may operate as a common-law dedication, in which case the fee of the land would remain in the proprietors, but the use for the

purposes designated would be in the public of the locality indicated.

"But there must be an acceptance by the public before the dedication would take effect. If in a village which is incorporated, and has a legal existence as a municipal corporation, the acceptance must be by the public authorities of such village. If, however, the public of the locality is not incorporated as a city or village, then I think the acceptance may be shown by acts *in pais* of the people of the locality; such as joining together, with the concurrence of the proprietor, in furnishing money by subscription, or doing work and labor, with the intent to carry out the design of preparing the ground for the purpose of its dedication as a park. I think that in the case of an unincorporated village, as this was, no better mode of acceptance could be devised, and that it should be held binding. See *Baker* v. *Johnston*, 21 Mich. 346–351. In this case the proof tends to show that Edgar Conkling, while managing the property, sold lots according to the plat; that he joined with the people in fitting the grounds for public use in holding picnics and other public gatherings, which continued for several years. If the case depends on this alone, I think I should have to hold that such acts on the part of the inhabitants, acquiesced in by Mr. Conkling, would amount to sufficient acceptance of the dedication offered, and would be binding on the proprietors.

"This, however, is not all. It appears by the bill of complaint, which appears to be admitted by the answer, that on the 15th day of January, 1870, and after Edgar Conkling had acquired the interest of the other proprietors in the lands in question, he (Edgar Conkling), together with his wife, made an instrument by which, after some preliminary matter, they do dedicate and convey to public uses the park in question, upon the express condition that such land shall forever be used and remain a public park, and be fenced and kept in condition by the legal authorities of Mackinaw City; which declaration was duly recorded. This, of course, proceeds on the theory that the former offer to dedicate had not been accepted. But at this time —January, 1870—the village of Mackinaw City had not been incorporated, and had no legal authorities. It was not incorporated until April 10, 1883. According to the terms of this dedication of 1870, no one but the legal authorities of the village had power to comply with the condition, and the offer should stand open till the village

should be incorporated, and legal officers were elected, and for a reasonable time thereafter. But it appears in this case that, almost immediately after the village was incorporated, Mrs. Conkling, who had acquired the title, undertook to fence a part of the park,—not, however, so as to entirely close the same against the public,—thus exercising a right of ownership, but not taking exclusive possession. And about that time the village authorities began taking steps to improve the park and care for it. It is claimed that the condition in regard to fencing the park and caring for it is a condition precedent, so that, until performed, the village would acquire no rights. On the other hand, it seems to me to be a condition subsequent, to be enforced, if at all, by forfeiture. But, as already stated, I do not think the rights of the village depend on this paper of 1870. That was made, as it appears, voluntarily, and in disregard of the rights of the public. I am of the opinion that the bill should be dismissed, with costs."

The statement of the facts made by the judge is fully warranted by the testimony. It only remains to be seen whether he reached correct conclusions of law.

It is claimed on the part of complainant that there was no intent to dedicate the park presently, and that there was no offer to dedicate the land, except the conditional offer made in 1870. In the case of *People* v. *Beaubien*, 2 Doug. 256, which was a case where a plat or map had been prepared, but was not properly acknowledged, so as to constitute a statutory dedication, and deeds had been subsequently made referring to the map, it was held that the deeds, with their references, were proper evidence as acts *in pais* to establish a dedication upon general rules of law, independent of the statute. It was also held they were not conclusive, and that other proof might be offered to show that no dedication was intended; and this case is cited with approval in *People* v. *Jones*, 6 Mich. 176. In *Village of Grandville* v. *Jenison*, 84 Mich. 54, it is said:

"The making of a plat of lands by the proprietor, showing lots, blocks, and streets, evidently for the use of those who shall come to occupy the property, and the subsequent sale of the property in lots or blocks according to

such plat, as was done in this case, is one of the clearest ways of declaring an intention to dedicate. Such an act has been held to conclude the owners, so far as the rights of subsequent purchasers are concerned (5 Am. & Eng. Enc. Law, 405, and cases cited); but the owner is not concluded as to the public unless the dedication be accepted by the public."

See, also, *Tillman* v. *People*, 12 Mich. 401; 2 Dill. Mun. Corp. (4th Ed.) § 636; *Board of Sup'rs of Cass Co.* v. *Banks*, 44 Mich. 467.

In *Baker* v. *Vanderburg*, 99 Mo. 378, it is said:

"To constitute a common-law dedication, there must be an acceptance by the public. 2 Herm. Estop. § 1142. We have held, where there is an unconditional attempt or offer to dedicate a parcel of land for a public square, and such offer is followed by adverse use by the public, that such use is a sufficient acceptance. No formal acceptance by the corporate officials is necessary in such cases. *Price* v. *Town of Breckenridge*, 92 Mo. 382. The acceptance is sufficiently indicated by common use; certainly so in the case of a square or park. *Abbott* v. *Inhabitants of Cottage City*, 143 Mass. 521 (58 Am. Rep. 143)."

See 2 Dill. Mun. Corp. (4th Ed.) § 645; *White* v. *Smith*, 37 Mich. 291.

The case of *Attorney General* v. *Abbott*, 154 Mass. 323 (13 L. R. A. 251), is quite in point. There the owners platted ground, and marked upon the plat spaces as parks, published pamphlets showing the spaces so marked, and sold lots. There was at this time no incorporated village to take action, but the spaces were regarded by the public as parks, and a very little was done to improve them by the villagers. The court used this language:

" The fact that not much was done to adorn these spaces, and that the corporation itself did whatever was done in this respect, and to some extent assumed to exercise a certain control over the land, is not of much weight in opposition to the conclusion to which we have come. The chief element of a public park in such a place, at least till the village is well settled, is to have the land kept open. The adornment would naturally come later, if at all.

The corporation did a little towards improving and caring for these open spaces. It had some interest in doing so. Ordinarily, when parks are established for public use, the municipal authorities exercise control over them. Washb. Easem. 146, 147, 156. It was not so here. Whatever was done was done by the corporation, which, to some extent, did what municipal authorities usually do. The corporation was interested in pushing its speculation, and, as long as it had many lots left for sale, it did something for the parks; but afterwards they were much neglected. On the whole, we think the evidence is sufficient to show an offer to the public of the spaces shown on the last two plans as Ocean, Hartford, and Waban Parks. * * * Without dwelling upon various other particulars of the evidence which tend in the same direction, we cannot doubt that it was a part of the scheme of the enterprise or speculation that the public should understand that these spaces should be left open for public use, and that no right was reserved to sell them for building lots; and that the corporation held out to the public this assurance, and at the time fully and fairly intended to give up this right. * * * The acceptance of such a dedication at common law need not appear of record, and need not be by the town. The acceptance is by the public at large, and the principal thing to show it is use by the public. Washb. Easem. 128, 139, 140. There is no need of a formal grantee. The fee remains in the original owner. *City of Cincinnati* v. *White's Lessee*, 6 Pet. 431. No assent of the town is necessary, because no burden is put upon the town, as in the case of a way. The improvements upon a park thus dedicated are left to be made by those who are interested. The town may take it up, or it may be left to individuals. If in a seaside summer resort no improvements at all are made, there will still be some benefit from having a space left for air, and for an open, unobstructed prospect. Whether the easement of a public park could be accepted merely by enjoying an unobstructed view over it of the ocean need not be considered. Various other acts of use of all the parks are shown, sufficient to show an acceptance of them by the public. Such acceptance need not be very specific.

" The defendant contends that such acceptance must have been by the town of Edgartown originally, or by the town of Cottage City afterwards. The chief argument in support of this view is that there must be some-

body who can be held responsible for the abatement of a
nuisance, if one should exist upon the property; and that
if the dedication is not to the town, and accepted by the
town, there is virtually no owner of the property. This
argument is of force, but the technical answer is that the
fee remains in the original owner. The dedication for a
park carries only an easement. This easement is not in
the town, but it is in the public at large. There may be in-
conveniences in this doctrine, in cases which are suppos-
able and possible, but the doctrine itself has been widely
adopted, and has been expressly recognized as in force in
this Commonwealth. *Abbott* v. *Inhabitants of Cottage
City*, 143 Mass. 521 (58 Am. Rep. 143)."

In *Baker* v. *Johnston*, 21 Mich. 346, this language is
used:

"Where the land platted falls within a city or incorpo-
rated village, and there are corporate authorities having
control over public lands and easements, there is no diffi-
culty in holding that the acceptance must come from the
authorized public agents, in order to give the public any
rights in the dedicated premises. If those who have
authority neglect or decline to act, then no force can be
given to the acts of those who have no authority. The
statutes have provided for certain cases of public user of
highways, but for nothing further. And dedications for
other than highway purposes require acceptance in a differ-
ent way. But it sometimes happens—and it was so in
the case before us—that land is platted where no incorpo-
ration exists, and where there is no certainty that the
locality will become an incorporated town or city within
any reasonable time. The population required for an in-
corporated village must be at least three hundred to the
square mile, and the village itself must contain that num-
ber. And while that must be a very small village which
falls short of three hundred, yet there are such villages;
and, if persons should see fit to provide squares and other
conveniences and adornments for these small settlements,
there would seem to be no sound reason why their validity
should not be maintained, although an intention to make
a dedication for such limited purposes may not, perhaps,
be so easily inferred as for larger settlements. In deter-
mining whether a dedication has become complete, it will
become necessary in such a case, as it is in the other case,
to ascertain what the person dedicating must be assumed

to have reasonably expected would be done by others to meet his offer, and to secure the application of the property to such uses and in such manner as will carry out the design of the dedication. And it may also become a serious question how far the want of corporate capacity may interfere with the acceptance of a dedication that is lacking in some of the elements of certainty."

In the case at bar the ground set apart for a park was historic. It had been the site of a fort which had played an important part in the early settlement of the State. The land was covered with a fine growth of trees. It was bordered by one of the Great Lakes. The outlook was exceptionally fine. If left in a state of nature, it would still be a magnificent park; but it was not left so. The inhabitants, prior to the incorporation of the village, cleared out some of the underbrush, used the ground for picnics, and subjected it to such uses, as a place of general resort for recreation, as might be expected from a community of a like number of inhabitants. See *Archer* v. *Salinas City*, 93 Cal. 43 (16 L. R. A. 145); *Ruch* v. *City of Rock Island*, 5 Biss. 95; *Price* v. *City of Plainfield*, 40 N. J. Law, 608; *Cummings* v. *City of St. Louis*, 90 Mo. 259; *Rutherford* v. *Taylor*, 38 Mo. 315; *Carter* v. *City of Portland*, 4 Or. 339. In the last-named case it is said, quoting from *Rowan's Ex'rs* v. *Town of Portland*, 8 B. Mon. 250:

"To say that a dedication to the use of the future town and of the public, made when the site of the town was in a state of nature, would be lost if not followed by immediate and continued use, or should be limited to the extent to which it was thus used, would deprive the dedication of its practical and its intended value, and would make it a mockery."

See *Town of San Leandro* v. *Le Breton*, 72 Cal. 170.

In the use of a street, where the municipality may be subjected to the expense of erecting and maintaining bridges, or may be liable to persons injured when the streets are not reasonably safe and fit for travel, there is much force in saying that there should be some formal

action taken by the municipal authorities tending to show an acceptance before the dedication should be effective; but in a case like this, where the property, when the offer to dedicate is made, is a beautiful natural park, whose use would be beneficial, and where the villagers have paid more for their homes than they otherwise would because of the assurance that this land was a park, and where the offer to dedicate was made before there was an incorporated village, we do not think it necessary there should be formal action by municipal authorities before the public shall be entitled to the advantages growing out of the proposed dedication.

The decree is affirmed.

The other Justices concurred.