FLORIDA EAST COAST RAILWAY COMPANY, A CORPORATION
  UNDER THE LAWS OF FLORIDA, APPELLANT, V. GEORGE A.
  WORLEY AND MARY K. WORLEY HIS WIFE, HARRIET MC-
  BRIDE AND LEE MCBRIDE HER HUSBAND, SARAH CURRY,
  WALTER CURRY, CORRINE CURRY FOGARTY AND JOSEPH
  FOGARTY HER HUSBAND, NEWTON CURRY AND BERTHA
  CURRY, THE LATTER BEING A MINOR AND W. HUNT
  HARRIS HER GUARDIAN *ad litem,* AND W. HUNT HARRIS
  AS ADMINISTRATOR OF THE ESTATE OF CHARLES CURRY,
  DECEASED, ELIZABETH P. HUNTER AND JAMES G. HUNTER
  HER HUSBAND, MARGARET ASHBY AND RICHARD ASHBY,
  HER HUSBAND, EDWARD E. GOLD, PHILIP HAAS, LUTHER
  T. TOWNSEND, ANDREW BURGESS, SYBIL JENKINS, ANNA
  MOREL PARRY AND CHARLES PARRY HER HUSBAND, AND
  ELIZABETH HAINES PARRY, APPELLEES.

1.  Where the owners of a tract of land make a town plat there-
    of, laying same out into lots and blocks with intervening
    streets separating the blocks clearly indicated upon the
    plat and sell and convey lots with reference to such plat,
    they thereby evince an intention to dedicate the streets to
    public use as such, and their grantees as against them and
    those claiming under them acquire the right to have the
    streets kept open, even though no formal written instru-
    ment of dedication is ever executed.  The rule applies not
    only to streets and avenues, but to parks and other pub-
    lic places designated upon the plat.  The word "park"
    written upon a parcel of land designated upon the plat,
    implies that such parcel is dedicated to the public for
    park purposes, and the sale of lots with reference to
    such plat, especially where such lots abut the park or are
    separated from it only by a street carries with it the
    right on the part of the grantees to have the parcel used
    for public park purposes only.

2.  Where the owners of certain land prepared and filed in the
    office of the clerk of the Circuit Court of a county a plat

thereof exhibiting thereon the land as laid off into blocks, lots and streets as and for a town, and a parcel shown thereon was marked **PARK**, the fact that a written dedicatory instrument attached to the plat only purported to dedicate the "streets or highways" shown thereon, does not in the absence of other language showing clearly an intention not to dedicate the park, operate as a reservation of such parcel from dedication, and the sale of lots with reference to such a plat operates as a dedication of the parcel for public park purposes.

3. A plat of lands laid off as a town with a dedicatory statement attached thereto prepared and filed by the owner of the land with reference to which lots are sold by him, must, like all other written documents, be construed as a whole in order that the intention of the party may be ascertained, and every part of the instrument be given effect. If the document is ambiguous in respect to the extent of the dedication the construction must be against the dedicator and in favor of the public. All parts of the instrument should be considered harmonized and given some effect if possible, and no part should be rejected as meaningless if that can be avoided.

4. The owners of a tract of land filed in the office of the clerk of the Circuit Court of a county a plat of such tract purporting to be laid off into town lots and blocks with streets running east and west numbered from one to twenty-seven, and avenues running north and south lettered from A to M. The Miami river, emptying into Bay Biscayne was represented on the plat as running through the city in such a manner as to cut through certain streets, leaving parts of each of said streets north and parts south of the river. None of the streets were represented as extending to the waters of the river, as they all purported to open into streets running nearly parallel with the river on each side known as North and South River Streets, which left small strips of land between these two streets and the river. Bay Biscayne was represented as lying on the east, and all the streets numbered from 1 to 14 open into an avenue or street called Biscayne Drive running nearly parallel with the shores of the bay. A nar-

row strip of land lying between Biscayne Drive and the bay was divided into small lots by lines drawn across it in various places, but these lots were not designated or numbered in any way, except that part of the strip extending from a line drawn opposite the center of 3rd street to a line drawn opposite the center of 7th street, which was marked in large letters "PARK." Upon this plat was written a dedicatory statement by the owners, acknowledging that they had caused the plat to be made followed by the language "and we do hereby dedicate to the perpetual use of the public the streets or highways shown thereon, reserving to ourselves, our heirs, successors, personal representatives or assigns owning lands abutting or adjoining the same, the reversion or reversions thereof whenever discontinued by law; also reserving that certain strip of land which lies on the easterly side of Biscayne Bay Drive, between said drive and the shore of Bay Biscayne, including in said reservation all riparian rights adjacent to said strip which extends from 14th street to the northern limits of the plat; also reserving such strips of land with riparian rights as are shown by the above plat to lie between the Miami river and the streets running parallel thereto." Many lots were sold in the town according to this plat, including the lots abutting Biscayne Drive. Held, that the plat properly construed shown an intention to dedicate the parcel marked "Park" as a public park, and to reserve from dedication the balance of the strip lying between Biscayne Drive and Bay Biscayne and all riparian rights incident or appurtenant to the entire strip so far as the dedicators owned it; Held further, that purchases of lots according to the plat, particularly those owning lots adjoining the park or separated from it merely by a street, have a right to insist that the park be kept open as a public park, even though the city authorities have never formally evinced an intention to accept the dedication.

5.    Section 680 Revised Statutes of 1892, which purports to grant authority to a city or town council to discontinue parks, has no application to a park laid out or established after the adoption of the Revised Statutes.

6. Where a bill was brought by a party claiming certain lands in a town seeking to enjoin other persons alleged to be trespassing thereon under a claim that the parcel in controversy was a public park which they as adjoining lot owners had a right to insist should be kept open; and all parties claimed title by deeds referring to a town plat prepared by former owners who laid the lands off into town lots and sold them according to the plat and who had deeded all their right in the alleged park to complainant, neither such former owners, nor the city in which such lands were located were necessarily parties, if not appearing that such former owners or the city were trespassing upon or claiming any rights in the property which the defendants claimed to be a park, nor that they owned any lots abutting such park or situated in the immediate neighborhood thereof.

This case was decided by Division A.

Appeal from the Circuit Court for Dade County.

The facts in the case are stated in the opinion of the Court.

*Geo. M. Robbins,* for Appellant.

*A. W. Cockrell & Son,* for Appellees.

CARTER. J.  On August 8, 1896, a plat was filed in the office of the Clerk of the Circuit Court of Dade county made by authority of Mary Brickell, William B. Brickell, her husband, Julia D. Tuttle and the Fort Dallas Land Company, showing certain lands laid off into blocks, lots, streets and avenues within the limits of what is now known as the city of Miami. This plat was prepared in June, 1896, by A. K. Knowlton, C. E., at the instance of the parties

named who owned all the lands shown on the plat, except a small parcel which was the property of one J. H. Day. Proceedings for the incorporation of the city of Miami were had on July 28th, 1896, and a transcript of the proceedings was filed in the office of the Clerk of the Circuit Court in August of the same year. The plat exhibits, among other things, many blocks divided into lots with streets running east and west numbered from one to twenty-seven, and avenues running north and south lettered from A to M. The Miami river which empties into Bay Biscayne is represented on the plat as running through the city in such manner as to cut through the streets numbered from 8th to 15th, leaving parts of each of those streets north and parts south of the river. None of these streets are represented as extending to the waters of the river, but those north open into North River street while those south open into South River street, which run almost parallel with the river, leaving small strips of land between those two streets and the river. The plat represents Bay Biscayne as lying on the east, and all of the streets numbered from one to fourteen open into an avenue or street called Bicayne Drive, which runs nearly parallel with the shores of the Bay. The plat represents a narrow strip of land varying in width as lying between Biscayne Drive and the Bay. Blocks Nos. 1, 20, 21, 40, 41, 60, 61, 80, 83, 100, 102, 119, 120 and 127 lie west of and abut upon Biscayne Drive. The strip of land between Biscayne Drive and the Bay is divided into small lots or parcels by lines drawn across it at various places, but the lots are not numbered or designated in any manner except those extending from a line drawn across the strip opposite the center of 3rd street, to a similar line drawn across it opposite the center of 7th street, which is

marked in large letters P A R K.  Upon the plat filed
with the clerk the parties before named signed and sealed
a written statement as follows: "Know all men by these
presents that we (naming the parties) have caused to be
made the foregoing attached map of (describing certain
lands) lying and being in Dade county, State of Florida,
to be known as Miami; and that we do hereby dedicate
to the perpetual use of the public the streets or highways
shown thereon, reserving to ourselves, our heirs, succes-
sors, personal representatives or assigns, owning lands
abutting or adjoining the same, the reversion or rever-
sions thereof whenever discontinued by law; also reserv-
ing that certain strip of land which lies on the easterly
side of Biscayne Bay Drive, between said Drive and the
shore of Bay Biscayne, including in said reservation all
riparian rights adjacent to said strip, which extends from
14th street to the northern limits of plat; also  reserving
such strips of land with riparian rights, as are shown by
the above plat to lie between the Miami river and the
streets running parallel thereto. Witness our hands and
seals this 1st day of July, A. D. 1896." At the time the
plat was filed the county site was at Juno, about seventy-
five miles from Miami, and the plat remained there until
August 1st, 1899, when the county site was removed to the
latter place.  In September, 1896, the Fort Dallas Land
Company who owned many lots shown upon the plat, in-
cluding quite a number abutting upon Biscayne  Drive,
caused to be lithographed and very generally distributed
substantial copies of the plat on file, except that the dedi-
catory statement was omitted and the  parcel of land
marked Park on the plat on file was designated "Bay
Park" on the lithographed plats.  The company's agents
in selling property in the town exhibited to purchasers

VOL. 49, JANUARY TERM, 1905.          303

Fla. East Coast R. R. Co. v. Worley et al.——Opinion of Court.

the lithographed plats, but the deeds all referred to the plat on file. Many lots were sold by the respective owners and all the deeds made expressly referred to Knowlton's map "on file" or "on record" in the office of the Clerk of the Circuit Court of Dade county. In July, 1897, the company caused to be prepared and printed for distribution a supplement to an abstract of the property laid off as a city, which stated that the entire strip of land lying between Biscayne Drive and the Bay, was marked reserved on the Knowlton map, but it does not appear that defendants or their grantors were furnished with a copy of the abstract or that they ever saw it. The company also gives certain purchasers of lots leases of portions of the park and the water front adjacent thereto, terminable on notice, but it is not shown that any of the defendants accepted such leases. The defendants are owners of lots abutting Biscayne Drive, each of the deeds referring to the Knowlton map on file or on record, and the complainant claims to be the owner and in posession of the entire strip of land lying between Biscayne Drive and the Bay, extending from 14th street to the northern limits of the plat which includes the portion marked "Park." The complainant claims under conveyances of separate portions all of which refer to the Knowlton map on file or on record. These conveyances were made, some by Mrs. Tuttle, others by the Fort Dallas Land Company; while one was made by Joseph H. Day who owned a small part of the southern portion of said strip at the time the plat was made but who did not join the other parties in procuring it to be made. In 1897 complainant erected its terminals on a part of the portion marked Park, and has used it for terminal purposes ever since. In December, 1902, it fenced in a portion of the strip lying south of the

so-called "Park," embracing the part purchased from Day. The deeds to complainant purport to grant not only the entire strip of ground lying between Biscayne Drive and the Bay, but also all water rights appurtenant thereto. The strip prior to December, 1902, (except that portion actually occupied by the complainant for its terminals) was vacant property, but used by the public generally for business, commerce and pleasure in the same manner as other vacant property of similar character. The entire strip was regarded by many residents of the city as set apart for public park purposes, while others either understood it was private property or that its public character was questioned. The dedicators claimed that the strip was private property, and undertook to explain the presence of the words "Park" and "Bay Park" on the maps by saying it was originally intended that the entire strip should be made a private park and maintained as such until the commercial interests of the city should require its use for purposes of commerce, but that this purpose was abandoned because Joseph H. Day refused to join in the expense of beautifying the strip as a private park. The city authorities have never exercised any authority or control over the strip as public property, but on the contrary the council passed a resolution, at the suggestion of complainants attorney in 1903, by which it declined to accept the dedication of said strip as a park, if such dedication was intended by the filing of the Knowlton plat. The property was not returned for taxation, nor taxed until after 1901, when some portions of it were returned for taxation. The United States government has recently undertaken certain improvements at Miami for deepening the channel from the ocean into the bay, and excavating a refuge basin inside the bay on the east side provided com-

plainant will cut a channel from the refuge basin to the city and also a channel of certain dimensions running parallel with the water front of the city. The complain-ant desires to deposit the material taken from these chan-nels to be cut, upon the strip of land lying between Bis-cayne Drive and the bay and upon the submerged land adjacent thereto. After the fence was erected in 1902, it was cut in several places, once by one of the defendants, Worley, and the complainant was required to employ a watchman to prevent the cutting of the fence and other trespasses upon the ground. The complainant filed its bill alleging that these trespasses were committed at the instigation of the defendants who claimed that the strip of land was a public park, and sought thereby to per-petually enjoin them from trespassing upon its alleged property, and from asserting any interest therein as ap-purtenant to their lots, and to obtain other relief. A de-murrer was filed to this bill by defendants which was overruled, whereupon a portion of the defendants filed answers. Replications were filed to these answers and testimony was taken. Several defendants failed to plead to the bill and a decree *pro confesso* was entered against them. At the hearing the court dismissed the bill, from which decree the complainant entered this appeal. No question is presented as to the sufficiency of the allega-tions of the bill, but the arguments in this court are con-fined to two questions, *viz*: whether Mrs. Brickell and the City of Miami should have been parties to the suit, and whether the decree dismissing the bill was proper upon the pleadings and testimony.

It has frequently been held by this court that where the owner of a tract of land makes a town plat thereof, laying same out into blocks and lots with intervening streets

20 S C

clearly indicated upon the plat separating the blocks and conveys lots with reference to such plat, he thereby evinces an intention to dedicate the streets to public use as such, and his grantees as against him and those claiming under him acquire the right to have such streets kept open. Such acts constitute a complete dedication and the streets can not be closed up or obstructed unless in pursuance of legal authority. Price v. Stratton, 45 Fla. 33ʼSouth. Rep. 644, and other Florida cases therein cited. This is true although there is no formal written dedication accompanying the map and the rule stated applies not only to streets and avenues, but to parks and other public places designated upon such plat. The word park written upon a parcel of land designated upon such a plat, implies that such parcel is dedicated to the public for park purposes, and the sale of lots with reference to such plat especially where such lots abut the park or are separated from it by a street only carries with it the right on the part of the grantees to have the parcel used for public park purposes. These propositions are abundantly supported by authority. San. Leandro v. LeBreton, 72 Cal. 170, 13 Pac. Rep. 405; Conrad v. West End Hotel & Land Co., 126 N. C. 776, 36 S. E. Rep. 282; Trustees of Watertown v. Cowen, 4 Paige's Ch. 510, S. C. 27 Am. Dec. 80; Archer v. Salinas City, 93 Cal. 43, 28 Pac. Rep. 839, S. C. 16 L. R. A. 145; Pierce v. Roberts, 57 Conn. 31, 17 Atl. Rep. 275; Steel v. City of Portland, 23 Oregon 176, 31 Pac. Rep. 479; Rhodes v. Town of Brightwood, 145 Ind. 21, 43 N. E. Rep. 942; Price v. Inhabitants of Plainfield, 40 N. J. L. 608; Grogan v. Town of Hayward, 4 Fed. Rep. 161. See, also Attorney General v. Abbott, 154 Mass. 323, 28 N. E. Rep. 346; 2 Dillon on Munic. Corp. section 644.

These principles are not denied by appellant, but it contends that the dedicatory statement written on the

map only purports to dedicate *streets or highways,* not a park, and that the reservation of the strip of land in that instrument shows a clear intention not to dedicate the property as a public park. It contends further that if the parcel is not reserved as private property without restriction, the most that can be said is that it is reserved for a private park, which was the real intention of the parties, and being so reserved the parties were at liberty at any time to abandon it as a private park and devote it to other uses. On the other hand the appellees insist that the reservation clause, giving to the word "reserving" its technical meaning which it is contended the same word in the preceding clause evidently bears, shows clearly an intention to dedicate the park, but to reserve in the same manner as in the preceding clause certain rights when the park shall have been discontinued by law, and in addition the water rights appurtenant to the strip.

We attach no importance to the failure to mention the park in connection with "streets or highways" in the dedicatory statement. If there is nothing in the reservation to withdraw the park from dedication, the filing of the plat with the word "park" written upon a parcel exhibited thereon, and the sale of lots according to the plat, would operate as a dedication notwithstanding the omission to mention the park in the dedicatory statement. Conkling v. Village of Mackinaw City, 120 Mich. 67, 79 N. W. Rep. 6. What then is the proper construction of the plat with respect to the strip of land lying between Biscayne Drive and the bay, and the water rights appurtenant thereto? Only that portion of the strip, extending from a point opposite the center of 7th street to a point opposite the center of 3rd street is designated as a park on the plat, but that portion is plainly marked in large letters "Park." We have shown that the marking of the

parcel in this manner indicates that the parcel was dedicated for a public park. The dedicatory statement purports to reserve the entire strip. There is consequently an apparent inconsistency between the different parts of the plat. How then should it be construed? The plat is a written instrument, and like all other documents must be construed as a whole in order that the intention of the parties may be ascertained, and every part of the instrument be given effect. City of Noblesville v. Lake Eri & W. R. Co., 130 Ind. 1, 29 N. E. Rep. 484. If the document is ambiguous, the construction must be against the dedicator and in favor of the public. Elliott on Roads & Streets (2nd ed.) section 119. In City of Alton v. Illinois Transportation Company, 12 Ill. 38, the court say: "When a deed is so drawn that some will read it one way and some another, it is a well established rule that that meaning shall be adopted which is adverse to the interests of the grantor. In Cruise' Dig. Tit. 32, Deed Chap. 19, section 13, the rule is thus stated: 'a deed is always construed most strongly against the grantor. * * * For the principle of self interest will make men sufficiently careful not to prejudice themselves by using words of too extensive a meaning. And all manner of deceit is hereby avoided in deeds; for people would always affect ambiguous expressions if they were afterwards at liberty to put their own construction on them.' If there be ambiguity in this deed, in no case could this rule apply with more reason or justice. Here the parties have made their deeds and spread them upon the records of the county for the inspection of the public whereby they have made certain dedications, the object and effect of which was to invite purchasers and improvements and to enhance the value of the residue of the town property. In that way they expected to be remunerated for the dedications thus made,

and every man who purchased a lot of them or made improvements there, paid a proportion of the consideration, for the property donated to the public. To say the least of it these deeds were so drawn as to induce a large proportion of the purchasers to believe that the premises in controversy were dedicated, and thus they have received a consideration from the public for this very land, and to allow them now to say that they did not intend to include it is to allow them to practice a palpable fraud upon the public and to take advantage of their own wrong. This the plainest dictates of common honesty forbids. The law will not allow them to affect ambiguous expressions, and then permit them to put their own construction upon them. Here the words are emphatically their own, for the grantees—the public—were not there to dictate or suggest and certainly the principle of self interest was sufficient to make them 'careful not to prejudice themselves by using words of too extensive a meaning.' " If by reason of the words *"also reserving"* used in this clause, we should construe the reservation to be similar to the reservation in the preceding clause with respect to streets, as contended by appellees, then the reservation would include simply the reversion when the park should be discontinued by law and this reservation would be secured, not to the dedicators, but to persons owning lands abutting or adjoining the strip so dedicated as a park. No person would own lands abutting or adjoining the park to whom the reservation could be made applicable. Lots west of the strip abut upon Biscayne Drive, a public street, and not upon the park. No lots lie east, simply the bay. A construction which would secure the reversion in the property alleged to be a park to the owners of lots abutting Biscayne Drive, on the theory that

those persons own lots abutting or adjoining the park property will not only obviously violate the real intention of the dedicators, but strain the language used beyond the most liberal interpretation. Neither can we interpret the instrument as meaning that the dedicators reserved the entire strip for a private park. There is nothing to indicate that the word "park" was intended to have such a meaning. There is no intimation anywhere upon the plat that the parcel marked park was to be reserved as a private park.

In Baker v. Vandeburg, 99 Mo. 378, 12 S. W. Rep. 462, one of the cases relied on by appellant, a block on a plat marked "This park is reserved *from public use,* and title kept in proprietors," and the court held that the block was not dedicated by the filing of the plat and sales of lots referring thereto. In this case we have no such provision—not a line indicating that the park was not to be a public one—not a word indicating that the dedicators reserved the property as a private park. City of Indianapolis v. Kingsbury, 101 Ind. 200. Nor can we accept as sound the suggestion of appellant, that the reservation clause shows clearly an intent to reserve from dedication the entire strip of land between Biscayne Drive and the bay, for to do that we would be compelled to deny any effect whatever to the word "park" written upon a portion of the strip, which word as we have seen imports a dedication to the public for park purposes. The rules of construction do not authorize us to reject any portion of an instrument as meaningless if that can be avoided, but rather to harmonize and give effect to the whole. The designation of the parcel on the plat as a park is particular, the so-called reservation is general. We can see that the general reservation was not drawn with technical accu-

racy, for its language is broad enough to embrace the entire strip, while in fact the dedicators did not own it all. A portion belonged to Joseph H. Day who had not author- ized the plat. It was not necessary for the dedicators to attempt to reserve his property from dedication, yet the language used is broad enough to cover it. We do not see that this general clause so broadly written should have the effect of neutralizing the particular intent to dedicate evidenced by the placing of the word park upon a particular parcel. All parts of the instrument may be harmonized and given their legitimate effect by applying the general reservation to those portions of the strip not designated on the plat as a park and to the water rights incident to the entire strip. The use of the word "park" indicates an intention to dedicate the lots of land upon which it is written, but there is nothing to indicate that riparian rights are included in the dedication, except the bare fact that the lots dedicated are water lots. To guard against misconstruction of the real intention sought to be conveyed by writing the word park upon the lots it was entirely proper to specifically reserve or except the ripa- rian rights from dedication. Consequently it is proper to hold that all riparian rights incident to the parcel marked park are reserved. We hold, therefore, that the parcel of land lying between Biscayne Drive and the bay, extending from a line drawn across the strip at a point opposite the centre of 7th street to a similar line drawn across the strip opposite the centre of 3rd street, was and is dedicated as a public park, but that the balance of the strip, together with all riparian rights incident or appur- tenant to the entire strip are reserved from dedication and constitute private property. Whether riparian rights appurtenant to a water lot dedicated as a public park can

be so reserved as to authorize the dedicator or his grantee to fill in the submerged land between the lot and the channel, or otherwise use it as private property or for the benefit of commerce, is a question which does not seem to be presented by the facts in this record, and we intimate no opinion with respect thereto. The bill does not allege any trespass upon such riparian rights by the defendant, but the alleged trespassers are confined to the park and other parts of the strip. We simply construe the reservation clause, without undertaking to decide its validity in so far as the water rights appurtenant to the park lot are concerned.

In reaching the conclusions announced as to the interpretation of the reservation clause, we are not unmindful of the technical distinction between a reservation and an exception, and that we have placed upon the word "reserving" a meaning somewhat similar to the word "excepting." There is no arbitrary rule which requires that the technical meaning of these words shall be given them in every instance where used in grants, written dedications and other documents. The two words are frequently used interchangeably, and the technical meaning will be made to yield to the manifest intention. 13 Cyc. 674. We think the word "reserving," though coupled with the word "also," which if accurately used might be construed to imply a close connection in the thought attempted to be expressed with the thought expressed in the preceding clause where the word "reserving" is used, was obviously used in the sense of a keeping back or withholding from dedication, and we so construe it. If our construction is correct it is evident the court below erred in dismissing the bill upon the theory that the entire strip of land between Biscayne Drive and the bay was a public park.

VOL. 49, JANUARY TERM, 1905.     313

Fla. East Coast R. R. Co. v. Worley et al.—Opinion of Court.

The appellant contends, however, that even under this construction the dedication would not be complete until accepted by the city authorities; that until so accepted the filing of the plat would constitute a mere offer to dedicate, and that the city authorities of Miami having by resolution declined to accept the dedication the offer became null and void. But the authorities hold that purchasers of lots by a plat filed showing the dedication of a park acquire a right to have the park kept open as a public park. This is particularly true with respect to persons owning lands adjoining the park or separated from it merely by a street, as is the case with the defendant here.

Appellant refers us to section 680 Rev. Stats. of 1892, which purports to give authority to a city or town council to discontinue parks, but if we concede that a resolution refusing to accept the dedication of a park is authorized under power given to discontinue parks, and that it is competent for the legislature to confer such power upon cities the section referred to does not help here, because it is confined to parks laid out or established prior to the adoption of the Revised Statutes in 1892, while the park here in question was established long after that time.

Another question relating to parties remains to be considered. Appellees contend that Mrs. Brickell and the City of Miami are indispensable parties. The object of the bill is to secure an injunction against the defendants who are alleged to be trespassing upon complainant's property, and to secure a decree quieting its alleged title as against the defendants who own lots abutting Biscayne Drive and who are alleged to be specially and particularly interested by reason of such ownership over and above the general public, in maintaining the alleged park. Neither Mrs. Brickell nor the city are shown to own property in

the neighborhood of the park, nor are they shown to be trespassing upon or claiming any rights in the park property. The mere fact that Mrs. Brikell's plat and dedicatory statement are to be construed between people owning lands conveyed with reference thereto, but in which she has no interest whatever, does and can not make her an indispensable party. It is necessary to construe the plat because all the parties to this suit have titles derived from deeds referring to the plat and thereby making it a part thereof. Andreu v. Watkins, 26 Fla. 390, 7 South. Rep. 876. In construing the plat we are merely construing the deeds under which the parties to the suit claim, and in the property involved Mrs. Brickell is not shown to have or claim any interest whatever. Nor do we think the City of Miami an indispensable party. It claims no rights adverse to the complainant, indeed through its legislative body it has by resolution attempted to divest itself of all rights it might claim from the dedication by refusing to accept it. It is not sought to compel the city to accept the dedication, nor to improve or do any other act with respect to the park nor to enjoin it from so doing. It is true that the city council has adopted a resolution purporting to decline the acceptance of the dedication of the park, but we do not see that the city is an indispensable party to a proceeding between other persons, in which the city is shown to have no interest, merely because the validity of the resolution so far as it affects his rights may be called in question by one of the parties. It is not enough to say that the city is interested in the question as to whether the strip of land is to be held a public park. That question it is necessary to determine in order to adjudicate the rights of the parties to this suit who claim certain property interests depend

ent thereon. But the city is in no sense interested in the matter so as to make its presence as a party indispensable, and as no objections as to parties were made in the court below, but are here raised for the first time, we can not hold the proceedings defective for want of parties.

The decree appealed from is reversed, and the cause remanded for such further proceedings as may be consistent with this opinion and equity practice.

WHITFIELD, C. J., and SHACKLEFORD, J., concur.

TAYLOR, P. J., and HOCKER, J., concur in the opinion.

COCKRELL, J., did not participate in the decision.