630 So.2d 586 (1993)
The CITY OF DAYTONA BEACH, Appellant,
v.
James R. TUTTLE, Appellee.
No. 92-1523.
District Court of Appeal of Florida, Fifth District.
August 27, 1993.
Rehearing Denied September 27, 1993.
Frank B. Gummey, III, and Marie Hartman, Daytona Beach, for appellant.
Glenn D. Storch, Daytona Beach, for appellee.
*587 COBB, Justice.
The City of Daytona Beach appeals from an adverse judgment quieting title in the plaintiff below, James R. Tuttle, in respect to a narrow strip of land abutting the Halifax River within the City. The property in dispute is on the easterly side of Sickler Drive (previously Riverside Drive) in the Ballough Subdivision, which was platted in 1923. That plat is shown below:

The disputed property lies between the platted road (hereinafter referred to as Riverside Drive) and the present high watermark of the river, which is a tidal estuary, in the area designated "Shore Slope." It is bounded by the easterly projections across Riverside Drive of the northerly line of Lot 6 and the southerly line of Lot 9. Tuttle claims riparian rights in conjunction therewith. In addition to his deraignment of title to Lot 9 and the easterly half of Lot 6, Tuttle relies upon quitclaim deeds to the disputed strip acquired from heirs of Ballough, who filed the 1923 subdivision plat. The defendant City did not claim ownership of the property adjacent to the water, but maintained the public had the right to use and control the property on the water side of the platted road pursuant to the accepted dedication in 1923 of the public street easement.
Testimony at trial established that both the City and various owners of Lots 6 and 9 had provided maintenance of the disputed land over the years. Extensive grading, clearing and planning had been done by the City around 1980. Tuttle has never objected to the maintenance done by the City during his ownership.
The plat shows only two lots on the river side of the street: Lot 18 on the southeasterly end, which is drawn with three solid-line boundaries but is open on its western side; and Lot 20 at the northwesterly end, with all boundaries shown as dashed-lines and part of *588 which overlays the right-of-way. A curved dashed-line is shown running from the open end of Lot 18 all the way to Lot 20. Although no measurements are marked, the dashed-line appears to be approximately 60 feet from, and parallel to, the solid-line of the Riverside Drive right-of-way. On one side of the curved dashed-line are the words "Shore Slope"; on the other side are the words "Halifax River."
Other evidence submitted at trial established that through the years since 1923, there has been considerable filling along the shore in the area adjacent to and north of this property, both authorized and unauthorized. Expert testimony focused on the probable extent of the shore on the easterly side of Riverside Drive at the time it was platted in 1923. An aerial survey in 1954 indicated the disputed strip opposite Lots 6 and 9 varied from zero to 15 feet. Current surveys show the width to vary from 32-47 feet.
Tuttle's expert witness, Wilbert, opined that the dashed-line running some 60 feet easterly of and parallel to Riverside Drive marked the high watermark and that the area in between designated as "Shore Slope" was "dry land" in 1923. Wilbert also, as an alternative interpretation, said the water line may have been the platted right-of-way itself.
The trial court found that "a measurable area of land existed in 1923 between the eastern edge of the 60-foot right-of-way platted as Riverside/Sickler Drive and the high watermark of the Halifax River across from Lots 6 and 9 (the subject property)." It further found that the dedicated public right-of-way did not touch nor approximately touch the Halifax River in 1923 or at any time since. The court also found that the City of Daytona Beach owned Lot 6 in the early 1940's, and quitclaimed it, including riparian rights, to Tuttle's predecessor in interest. No evidence, said the trial court, was introduced by the City that would justify "expanding the 60-foot wide dedicated street easement known as Riverside/Sickler Drive beyond the confines of its platted right-of-way." Thereupon, the court quieted title in Tuttle to Lot 9 and the easterly one-half of Lot 6, Charles A. Ballough Subdivision "together with any interest which (Tuttle) may have in and to the land lying easterly of Sickler Drive opposite the aforesaid Lots 9 and 6, whether exposed or submerged."
Argument in this case, both at the trial level and on appeal, has focused on whether the 1923 plat indicated a stretch of land separating Riverside Drive from the Halifax River which Ballough intended to reserve to his private ownership. The evidence before us conclusively shows that the answer to this question is that he did not so intend. There are several reasons for our conclusion.
First, it should be noted that even if some land existed easterly of the designated right-of-way in 1923, that fact would not be dispositive of the issue raised by the quiet title action. When a street touches or approximately touches the body of a navigable waterway, the riparian rights attached to the property subject to the street easement are impliedly dedicated as an incident to the easement. See City of Tarpon Springs v. Smith, 81 Fla. 479, 88 So. 613 (1921); Brickell v. Town of Ft. Lauderdale, 75 Fla. 622, 78 So. 681 (Fla. 1918). It must also be remembered that ambiguities regarding the extent of the dedication in the plat should be construed in favor of the public. Florida East Coast Ry. Co. v. Worley, 49 Fla. 297, 38 So. 618 (1905).
The dashed-line running parallel to the easterly solid-line of the street dedication provides the basis of Tuttle's claim. But that line simply cannot represent a high watermark because of its angular configuration at both ends. Moreover, the equivocal opinion offered by Wilbert (that there may have been 60 feet of dry land east of Riverside Drive) was based solely upon the parallel dashed-line on the plat. That opinion was unsupported by any evidence presented at trial, is inconsistent with subsequent plats and aerial photographs, and has no basis in the record. An 1883 plat of the area clearly shows the street in use at that time, corresponding to the later Riverside Drive, bordered directly on the Halifax River.
It is significant that Ballough did not assign a number to the area in question, although he did ascribe numbers (18 and 20) to *589 other lots, whether dry or submerged, lying easterly of Riverside Drive. The name "Riverside Drive" is suggestive in and of itself. Moreover, the term "Shore Slope," while somewhat ambiguous, is most analogous to the recognized terms "shore" and "shore lands," which are defined by Black's Law Dictionary, (rev. 4th ed. 1968), as follows:
SHORE. * * * Strictly and technically, lands adjacent to the sea or other tidal waters; the lands adjoining navigable waters, where the tide flows and reflows, which at high tides are submerged, and at lot tides are bare. [Citations omitted]. The space bounded by the high and lower water marks.
SHORE LANDS. Those lands lying between the lines of high and low water mark. [Citations omitted]. Lands bordering on the shores of navigable lakes and rivers below the line of ordinary high water.
Based on the foregoing definitions, it is clear that use of the word "shore" on a plat ordinarily does not connote dry land which is subject to private ownership. From a definitional approach, the area marked "Shore Slope" would seem to denote land waterward of the high watermark. See City of Tarpon Springs v. Smith, 88 So. at 619-620.
We also find it significant that there is no record showing that Ballough ever attempted to deed or devise the area herein at issue. In 1924 Ballough conveyed Lot 6 with "any riparian rights," clearly showing that he did not consider there was any land lying easterly of the dedicated road at that time, otherwise any such riparian rights would have accrued to that land rather than to Lot 6. The only theory upon which it could have been contended that Lot 6 carried riparian rights was that its fee extended across the dedicated street easement to the high watermark  not merely across the street easement to another piece of land abutting the high watermark. See Bonifay v. Garner, 503 So.2d 389 (Fla. 1st DCA 1987). Clearly, Lot 6 as platted by Ballough did not extend easterly of Riverside Drive.
Tuttle's claimed ownership of the property in dispute based upon quitclaim deeds from Ballough heirs is equally unavailing. If Ballough did not retain the property easterly of the road, it could not have passed to his heirs. A quitclaim deed from a nonowner conveys nothing. Nothing in the plat itself indicates a reservation of rights to Ballough in regard to the "Shore Slope" area. Cf. Burkart v. City of Ft. Lauderdale, 168 So.2d 65 (Fla. 1964).
A review of the plat, this record and the history of the disputed property leads to the conclusion that Ballough did not retain the disputed strip lying easterly of Riverside Drive and did not include it as part of Lots 6 and 9 on the plat. The alternate argument of Tuttle is that the City relinquished its riparian rights opposite Lot 6 by reasons of the 1942 quitclaim deed it executed to Tuttle's predecessor in title. That deed purported to relinquish any claim by the City to the following described property:
Lots three (3) four (4) and six (6) Ballough Sub Block thirty six (36) Mason & Carswell's Holly Hill, with Riparian rights, according to map thereof in the Public records of Volusia County, Florida.
It is well settled that where lands have been dedicated to a municipality the municipality holds the title in trust for the public and has no power, unless specially authorized by the legislature, to sell or appropriate such lands for the use and benefit of private interests. Kramer v. City of Lakeland, 38 So.2d 126 (Fla. 1948); City of Coral Gables v. Old Cutler Bay Homeowners Corp., 529 So.2d 1188 (Fla. 3d DCA 1988). While the City here under its charter had the power to vacate its streets and other public ways in 1942, see section 15, Chapter 19768, Laws of Florida 1939, State v. City of Daytona Beach, 42 So.2d 764 (Fla. 1949), the parties point to no legislative authorization for transfer of the riparian rights to a private interest.[1] The City thus did not transfer the riparian rights opposite Lot 6 when it executed *590 the 1942 quitclaim deed to Tuttle's predecessor in title.
Accordingly, we reverse and remand for entry of a judgment finding that the riparian rights herein in dispute are encompassed by the dedicated easement of the City of Daytona Beach and held for the benefit of the public.
REVERSED AND REMANDED.
GRIFFIN, J., concurs.
DAUKSCH, J., dissents, without opinion.
NOTES
[1] City Resolution 42-52 authorizing execution of a quitclaim deed as to Lots 3, 4 and 6 makes no mention whatsoever of riparian rights.