202 So.2d 760 (1967)
CITY OF MIAMI, Appellant,
v.
EASTERN REALTY COMPANY, Inc., Appellee.
No. 66-325.
District Court of Appeal of Florida, Third District.
August 22, 1967.
Rehearing Denied October 17, 1967.
*761 Jack R. Rice, Jr., City Atty., Miami, for appellant.
Edward C. Vining, Jr., and Milton R. Adkins, Miami, for appellee.
Before CHARLES CARROLL, C.J., and BARKDULL and SWANN, JJ.
CHARLES CARROLL, Chief Judge.
The City of Miami, one of the defendants in a suit to quiet title, appeals from an adverse final decree.
The circumstances leading up to the litigation are revealed in the record. On May 5, 1914, Walter E. Flanders, joined by his wife, executed a subdivision plat which was recorded in the public records of Dade County in Plat Book 2 at page 92. The land involved was rectangular in shape, approximately 700 feet in north and south dimension by 1,500 feet in east-west dimension, with its easterly boundary on Biscayne Bay. The property was located in the city of Miami, in the area of what are now Northeast 38th and 39th Streets. That first plat contained a dedication as follows: "It is understood that in filing this plat for record, that the streets or driveways or parks are not dedicated in any wise to the public, for the use and benefit of the lot holders of the lots as shown on said plat, and in case all of the said lots should revert or come into the possession of the grantors, their heirs or assigns, the said streets, alleys and parks may be closed or other disposition made of same."
*762 On August 23, 1915, an amended plat was executed, and recorded in Plat Book 2 at page 107. It contained a similar provision relating to dedication. A copy of part of the amended plat, showing the easterly portion of the subdivision is inserted.

Thereafter, On March 22, 1916, Flanders and his wife executed a second amended plat, which was recorded in Plat Book 5 at page 25. The provision in that final plat relating to dedication contained some additional wording, and read as follows:
"It is understood that in filing this plat for record, that the streets or driveways, or parks are not dedicated in any wise to the public but for the use and benefit of the holders of the lots shown on said plat, provided however that the walks and driveways as shown on this plat between lots B, C, D, E, 20 and 21 are for the use and benefit of the holders of the lots B, C, D, E, 20 and 21, as shown on said plat and are not in any wise dedicated to the public or other lot owners. In case all the lots on this plat should revert or come into possession of the grantors, their heirs or assigns, the said *763 streets, alleys, driveways and parks may be closed or other disposition made of same." There is set out hereinbelow a copy of that part of the Second Amended Plat showing the easterly portion of the subdivision as platted.

With reference to the Second Amended Plat, attention is directed to the narrow strip shown thereon lying between an unnamed street and Biscayne Bay, extending from a point near the south border of South Drive, on the south, to the south border or edge of North Drive, on the north. That area will be referred to in this opinion as the "park strip."
On October 7, 1919, Flanders (joined by his wife) and Flanders Realty Company by Flanders as its president executed an instrument amplifying the dedication made in the plats, specifically indicating the above mentioned *764 park strip as having been so dedicated. That instrument was recorded on January 2, 1920, in Deed Book 203 at page 389, and because of its importance in this case, the instrument is set out in the margin in full (omitting the acknowledgments[1]).
All of the lots in the subdivision were duly sold, and they have continued to be owned and possessed by the original purchasers or their successors in interest. The park strip has remained the same in area and location, and throughout the years certain of the lot owners have used it for the purpose for which it was dedicated. The street lying just west of the park strip, and which connects North Drive and South Drive, has remained as platted. It is now known as Northeast Sixth Avenue. The city paved that street area in 1947 and has continued to maintain it as a city street. Likewise the two east-west streets shown on the Second Amended Plat have been maintained by the city as public streets. The one designated as South Drive is a continuation of and now a part of Northeast 38th Street, a public street which has been extended eastward to connect with the Julia Tuttle Causeway. North Drive shown on the plat, is an extension of Northeast 39th Street, having its eastern terminus at Biscayne Bay. The city has installed sewer manholes, storm sewers, and overflow lines in the maintenance of the park and of the bordering streets. The maintenance by the city of the park strip as a park area has extended for a period of more than twenty years, consisting of cutting grass, trimming trees and shrubs, removing debris therefrom and removing debris collected against the seawall by the ebb and flow of the tide. In addition to use of the park strip by lot owners, there has been public use thereof over that period. No ad valorem taxes have been levied on the dedicated streets or park strip.
*765 Walter E. Flanders and his wife Hazel M. Flanders were divorced on April 16, 1921. Flanders died on June 16, 1923, a resident of Cook County, Illinois.
Forty years later, in the fall of 1963, when the United States Corps of Engineers was to perform dredging operations on the Intracoastal Waterway in Biscayne Bay, the city negotiated with that government agency to have spoil from the dredging deposited so as to fill in the submerged lands between the shore and the County Bulkhead Line at certain locations, for the purpose of establishing public parks thereon. One such location was the said area of submerged lands adjacent to the park strip and the end of Northeast 39th Street, extending into the bay a distance of approximately 400 feet, for use as a public park in connection with and in enlargement of the park area represented by the Magnolia Park subdivision dedication, the enlarged park to be known as Magnolia Park.
On October 16, 1963, the city passed a resolution "accepting" the dedication of the park strip, as a City of Miami Park, on the assumption that the dedication thereof had been to the public.
In furtherance of its plan to create such park areas in the bay, including the area adjacent to the subject park strip, the city caused a noticed hearing to be held on December 4, 1963, before the City Planning and Zoning Board to consider the project. At such hearing no objection was interposed by the plaintiff corporation or by anyone on behalf of the subdivider or his successors in interest. The board reported favorably, by a resolution which included the following:
"NOW, THEREFORE BE IT RESOLVED, that the Planning and Zoning Board of the City of Miami recommends the approval of the proposed plan for the development of the municipal parks in the Biscayne Bay area between McArthur Causeway and 79th Street Causeway, utilizing the fill which will be available from the Federal Waterway Improvement Project."
Also on December 4, 1963, the city passed a resolution requesting the Trustees of the Internal Improvement Fund to transfer to the city, for public park purposes, title to the submerged lands from the shoreline (seawall), between Northeast 38th and 39th Streets, to the County Bulkhead Line; and to grant to the Federal Government an easement at the designated location to deposit thereon spoil dredged from the Intracoastal Waterway.
On January 8, 1964, the Trustees of the Internal Improvement Fund executed an instrument which did not transfer title to the submerged lands to the city as the latter had requested, but which dedicated to the City of Miami the said area of submerged lands as therein described. The dedication thereof to the city was made expressly for public park purposes, and included certain conditions as follows:
"The above described lands shall be used for public park purposes only, under the supervision and control of the City of Miami, subject to the following provisions, to-wit:
"In the event the said City of Miami shall (1) use said land for other than public purposes, or (2) for a period of three consecutive years shall fail and neglect to maintain and use the same for said purposes, the dedication hereby made shall at the option of said Trustees, be subject to termination upon sixty days notice in writing by the Trustees to said City."
Thereupon, by a resolution dated February 5, 1964, the city allocated $6,800 from its Capital Improvement Fund to defray the excess cost to the government for transporting and depositing the fill (spoil) on the designated area. That sum was disbursed by the city for the purpose intended, and by August of 1964 the submerged land area involved was filled in as planned, and the city performed certain work thereon, such as leveling the fill.
*766 Meanwhile, during the period that the city was planning to construct such public park and was taking steps to accomplish its purpose, a party or parties whose identity in that connection was not shown, acquired the subdivider's old corporation, Flanders Realty Company (the name of which has been changed to Eastern Realty Company, Inc.) and proceeded to obtain deeds to the corporation from certain of the heirs or devisees of the subdivider Walter E. Flanders. One such deed to the corporation was obtained in September of 1963, one in October of 1963, and others were obtained in December of 1963 and later, the last being a quit-claim to the corporation dated March 6, 1965 from a successor trustee under the will of Flanders.
This suit was filed on February 15, 1965, by the said Eastern Realty Company, Inc. The initial complaint was against a single defendant, Chicago Trust Company. It alleged that the plaintiff is the owner of the park strip, and as to the defendant corporation alleged only that it "claims to have some right, title and interest in the property described." The complaint presented a metes and bounds description purporting to describe the park strip. The complaint did not make reference to the adjacent filled area. The prayer was for a decree quieting title to the park strip.
On March 16, 1965, the plaintiff filed an amended complaint joining as defendants the Chicago Trust Company, certain named heirs or devisees of Walter E. Flanders and their spouses, and their unknown heirs, etc., and also the City of Miami and Metropolitan Dade County. The amended complaint alleged that the Chicago Trust Company was dissolved, and that all of the individuals named as defendants were deceased, except Hazel M. Flanders (the widow of the subdivider, who had been divorced from him in 1921), as to whom it was alleged that her place of residence was unknown. That complaint alleged the plaintiff was owner of the park strip and, based thereon, alleged plaintiff was the owner of the filled in area in the bay extending from the seawall to the County Bulkhead Line; that the City of Miami and Dade County claimed some interest in the property, the extent of which (interest) was unknown to plaintiff, were attempting to exercise some control thereof, and on March 17, 1965, had deposited thereon "some type of construction materials and equipment," thereby becoming trespassers on plaintiff's property. The prayer was for a decree quieting plaintiff's title to the park strip; and quieting title in plaintiff to the "property described above" (which included the filled in area in the bay); and that the city and Dade County be enjoined from all construction or alteration of the property. A lis pendens was filed covering all of the property described in the complaint.
After hearing on notice, a preliminary injunction was granted on April 1, 1965. restraining the city and county "from digging any ditches, sluiceways or trenches on the real property which is the subject matter of this cause." The plaintiff was required to post an injunction bond of $3,500.
The city filed a motion to dismiss the amended complaint and a motion to strike certain portions thereof. Prior to a hearing on those motions the plaintiff moved for leave to amend the complaint. An order was entered denying the city's motion to dismiss and granting plaintiff's motion to amend. Thereupon the plaintiff filed its second amended complaint against the defendants as named in the first amended complaint[2] and adding as a defendant the Florida State Road Department.
The allegations and prayer of the second amended complaint were the same as those of the amended complaint. The only observable difference was the joining of the State Road Department, the inclusion thereof with the city and Dade County in alleging *767 that said defendants claimed some interest in the property, and the inclusion of the State Road Department with the city and Dade County in the prayer for injunctive relief.[3] It should be noted that the plaintiff did not join as defendants any of the persons owning or holding interests in lots in the subdivision, and therefore that their rights in the premises are not affected by this suit.
In the second amended complaint, as in the one which preceded it, the plaintiff alleged that it was the owner of the park strip and included a metes and bounds description thereof in paragraph 1; that by reason of its ownership of the park strip the plaintiff was the owner of the adjacent filled in area from the seawall to the County Bulkhead Line, consisting of 2.9 acres, and included a metes and bounds description thereof in paragraph 11. The second amended complaint repeated the allegations of the amended complaint that the city claimed some interest in the property and had placed machinery and made alterations thereon, and the prayer that plaintiff's title to both the park strip and the filled in area in the bay be quieted, and the city enjoined from asserting interest therein or performing work thereon.
The city filed an answer in which it denied ownership by the plaintiff of the park strip and of the adjacent filled in area, and admitted that it, the city, claimed title thereto. As the basis of its claim of title to the park strip, the city averred and relied upon the dedications in the plats of Magnolia Park, the dedication instrument shown above in footnote 1, which confirmed that the unmarked area along the bay had been dedicated as a park for use of the lot owners, the city's subsequent resolution accepting the dedication, and its maintenance of the park strip and adjoining street and the public user thereof. As the basis for its claim of right to construct and maintain a public park on the filled in area in the bay, the city averred and relied upon the dedication it had received from the Trustees of the Internal Improvement Fund granting it authority to fill in the submerged lands for park purposes, and its subsequent filling in of said area.
Further in its answer the city averred the steps taken in gaining approval of the park project, arranging with the United States Corps of Engineers for the deposit of fill on the submerged land area, the filling in of the area, its appropriation and expenditure of $6,800 therefor, and its subsequent work on the filled in (park) lands.
Incorporated in the answer of the city was a counterclaim, by which it sought damages from the plaintiff for allegedly presenting a false and malicious claim of title and thereby having hindered and delayed the city in the creation of the intended public park.
In the final decree entered after hearing, the subject for decision was stated by the chancellor as follows: "The question to be resolved by this Court, both legally and factually, concerns whether or not the plaintiff has a better claim to the fee simple title to the lands described in paragraph 1 of the second and third amended bills of complaint [the park strip] than does any or all of the defendants before the court." [Emphasis supplied]
Thereupon it was held that because the dedication as written showed absence of intent to dedicate to the public, no public dedication could result, and that the attempted dedication of the streets and park area for use of the lot owners was invalid *768 as being an attempt to make a dedication to a part of the public. Based on those holdings, the further holding of the trial court that the plaintiff is the owner of the park strip in fee simple, amounted to a ruling that the plaintiff is the owner thereof unincumbered by any dedication, or by any easement in the public or in the lot owners as the result of the attempted dedication. Although such holdings were adverse to the interests of the lot owners, who were not parties to the suit, the decree stated "nothing contained herein attempts to adjudicate the rights of the lot owners of Magnolia Park, or anyone else, who are not before this Court." The decree followed with a holding quieting title in the plaintiff against the city as to the park strip.
It is important to note that it was not held in the decree that the plaintiff was the owner of the filled in area of the bay, between the park strip and the County Bulkhead Line. However, without expressly so finding or holding, the chancellor appears to have accepted the position presented and contended for by the plaintiff that it was the holder of the riparian rights incident to the park strip and by virtue thereof was entitled to restrain the city from proceeding to develop and maintain a park on the filled in area. The decree contained a permanent injunction against the city having that effect.
On its appeal therefrom the city presents seven points. First is a contention that the dedication of the park strip for the use of the lot owners became effective upon sale of the lots, continues in effect and is not subject to be avoided or revoked by the subdivider.
That contention of the city is correct. In holding invalid and ineffective the subdivider's dedication of the streets and the park strip for the use and benefit of the lot owners, the chancellor was in error. McCorquodale v. Keyton, Fla. 1953, 63 So.2d 906. In that case owners platted certain land and sold off the lots. The plat contained a dedication of the streets to the public, but the dedication of a park area shown on the plat was "for the use of the property owners of said plat." A successor of the subdividers attempted to make certain personal or private use of a portion of the designated park area. An injunction obtained against him by lot owners was affirmed. In rejecting the contention of the appellant that the court committed error "in not decreeing that the dedication heretofore set forth was a nullity because it purported to create private rights in a group by dedication," the Supreme Court said:
"The contention of the appellants that the declaration is a nullity because it attempted to create private rights in a limited group by dedication has no application here. Considered, however, with the plat itself, upon which the land in question was clearly marked `Sunnyside Park', the evidence of the plaintiffs that they and others bought their lots relying upon said land being a park and the lot owners having the unrestricted use thereof, together with the fact  of which this Court takes judicial knowledge  that access to and use of the beach is an extremely valuable right to the owners of land such as is involved here, the effect  by whatever name it may be called  was to forever bar the developer from denying the owners that which he led them to believe they had."
In that case it was further stated by the Supreme Court that purchase of lots of such a plat, which designates parks or other facilities for their use, is binding on the subdivider and his grantees and that "the purchasers acquired, by implied covenant, a private easement in said Sunnyside Park as appurtenant to the premises granted and conveyed to them and that they [the subdividers and their successors] thus became bound to the grantees not to use the land designated `Sunnyside Park' other than as a park."
*769 It is immaterial whether the rights created in the lot owners, as a result of the sale to them of lots under the plat containing such a dedication, are classified as a dedication to them, or as easements in them for the uses expressed and intended. This is so because that which the lot owners acquire under such a "dedication" is a right to the use of the park or designated facility, in the nature of an easement, which the subdivider is required permanently to observe.
The appellant's second contention, which is that under § 95.36, Fla. Stat., F.S.A., the continued existence of the dedication for thirty years rendered it impervious to challenge, appears to be inapplicable here. The cited statutory section deals with dedications made to municipalities for public purposes. Here the express dedication in the plat was not one to the municipality.
Third, the appellant points out that by its work of surfacing, repairing and maintaining the streets adjacent to the park strip over a period of more than four years, the streets are deemed dedicated to the public as provided for in such case by § 337.31 Fla. Stat., F.S.A. Based on that proposition the appellant argues that the court erred in holding plaintiff was the owner of the park strip and quieting plaintiff's title thereto against the city.
Under the cited statute the surfacing and the maintenance by the city of Northeast Sixth Avenue bordering on the park strip, and of 38th and 39th Streets traversing the platted subdivision, can result in an easement in the public or a "dedication" of those streets to public use; and based on the holding in Indian Rocks Beach South Shore v. Ewell, Fla. 1952, 59 So.2d 647, 652, 32 A.L.R.2d 940, that the improvement and acceptance for the public of one street in a platted subdivision shall be considered as acceptance of all the streets, it can be argued with some force that the public "acceptance" of certain of the streets platted would apply to and result in acceptance for public use of a platted park area as well. However, we do not so hold here, because to do so would require that we extend the holding in the Ewell case in that connection, and because the question of whether the city has acquired an easement for public use of the park strip should be determined on the basis of the effect of the city's maintenance and the public user of the park strip itself.
The city points out as being an error in the decree the fact that the metes and bounds description of the park strip as it was alleged in the second amended complaint and used in the final decree, exceeds the area of the park strip as designated on the Second Amended Plat, and encroaches substantially on the adjoining streets. There is merit to that position taken by the city.[4]
*770 We reject as unsound the appellant's fourth contention, that the plaintiff failed to present evidence sufficient to show it to be the subdivider or the successor to the subdivider Flanders. The dedication instrument made in 1919 (shown in footnote #1) listed Flanders Realty Company along with Flanders as the owner of the property platted and subdivided. It is common knowledge that individuals putting on subdivisions in that period customarily formed a corporation and acted through it, as appears to have been done in this instance. Moreover, deeds or quit-claims were obtained running to the plaintiff corporation from devisees of Flanders. No challenge of the corporation's claim of title was made by or on behalf of the unknown heirs or devisees of Flanders (the known and named ones being deceased), and the city made no contrary showing. However, as the plaintiff is proceeding on the basis that it is the subdivider or his successor, its rights and title to the park strip can rise no higher than those of the subdivider, and it is bound by the subdivider's dedication of the park strip, and by the important fact that the subdivider did not reserve the riparian rights. Not only were riparian rights not reserved, but in executing the plat the subdivider expressly included the riparian rights in describing the lands involved.
Appellant's fifth point is its contention that the chancellor erred in ruling that by virtue of holding legal title to the park strip the plaintiff was entitled to an injunction against the city from going on or dealing with the filled property. We hold that contention of the appellant City of Miami is meritorious.
As pointed out earlier in this opinion, the chancellor did not hold that the plaintiff corporation was the owner of the adjacent filled in lands, the holding in the decree being that the plaintiff was the owner of the upland (park strip) and that by reason thereof was entitled to enjoin the city from further construction or development on the adjacent filled in area. In the latter ruling the learned chancellor was in error.
Assuming, as held in the decree, that the plaintiff is the owner of the park strip, the title held is only a bare legal title subject to the easement of the public if any has been obtained, and expressly subject to the easement of the lot owners for use of the park strip, to the exclusion of the subdivider to alienate, encumber or otherwise make use thereof inconsistent with the dedication. Moreover, such bare title as the owner retains to the park strip does not include riparian rights incident to that land. This is so because when the subdivider did not reserve the riparian rights they attached to the dedicated park strip. Ruge v. Apalachicola Oyster Canning & Fish Co., 25 Fla. 656, 6 So. 489. Also, on the authority of that case, the riparian rights to the portion of the shore at the easterly end of North Drive attach to that dedicated street. Therefore, any benefit resulting from the riparian rights, such as by accretion, would operate as an addition or extension of the park (and in the case of the street end, to use as a street) and would not be subject to personal use by the subdivider or his successors, as would have been the case if the subdivider had retained the riparian rights, as was done on dedication of a bay front park area by a subdivider in the case of City of Miami v. Florida East Coast Ry. Co., 79 Fla. 539, 84 So. 726.
From the foregoing it necessarily follows that the subdivider was without basis to claim rights in submerged lands adjacent to the park strip or adjacent to the street end of North Drive (N.E. 39th St.) and therefore was without ground to enjoin *771 the city from exercising right of control of the filled in area, which it was asserting under express authority of the state, the owner of the submerged land.
Moreover, the result would be the same; that is, that the subdivider would be without basis to so enjoin the city even if the subdivider were the upland owner of the park area free of incumbrances or easements and with riparian rights thereto. This is so because such ownership would not carry with it ownership of adjacent submerged lands in Biscayne Bay, but only would entitle the upland owner to a preferential right to acquire such submerged lands by purchase, upon application to the Trustees of the Internal Improvement Fund. City of Miami v. Wolfe, Fla.App. 1963, 150 So.2d 489, 490; Tri-State Enterprises, Inc. v. Berkowitz, Fla.App. 1966, 182 So.2d 40, 43. In the latter case, speaking through Associate Judge Ben C. Willis, the court said:
"It is quite true that the riparian rights conferred under the now repealed Sec. 271.01, F.S.A. are very different from those recognized and provided in what is now Sec. 253.12 F.S. 1965, F.S.A. and which may be implemented and facilitated by the bulkheading and filling provisions set forth in Secs. 253.122-253.128. However, the riparian rights now provided by statute are, like those repealed, appurtenances to the land, inseparable from it, and followed by operation of law any conveyance or encumbrance of it. Such rights are not in the nature of a qualified title in the adjacent submerged lands but are in the nature of a preferential right to purchase. * * *" [Italics supplied]
In this instance the plaintiff was not in a position to purchase the submerged lands, for the reasons set out hereinabove, but had it been entitled to do so, no such application for purchase of the adjacent submerged lands in Biscayne Bay was made to the Trustees of the Internal Improvement Fund prior to the time that body, by a formal instrument, gave the city an easement to fill in the submerged lands for the creation and maintenance by the city of a public park thereon. In so doing the Trustees of the Internal Improvement Fund did not violate the provision of the statute against sale of such submerged lands to one other than the upland owner. They did not sell or convey the submerged lands to the city, but only dedicated them to the city for park purposes, with a reservation for recovery thereof by the state if not used for the authorized purpose, or if permitted to go without maintenance as a park for a stated period.
When the city, pursuant to the authority received from the Trustees of the Internal Improvement Fund, caused the lands to be filled in, the area in question no longer constituted submerged lands. The right of purchase which the statute gives an upland owner is of submerged lands. Under the terms of the statute, after adjacent submerged lands have been filled in by a municipality or other state agency, the upland owner's right is limited to applying to the Trustees of the Internal Improvement Fund for a conveyance, without consideration, of such of the filled in lands as are "not required exclusively for the municipal * * * or public purpose." Thus in § 253.12 Fla. Stat., F.S.A., entitled "Title to tidal lands vested in the state," in subparagraph (1) thereof, after having made provision that the raparian owner could apply for purchase of adjacent submerged lands and that such submerged lands should not be sold to one other than the riparian owner, it is provided as follows:
"When any state agency, county, city or other political subdivision extends or adds to existing lands or islands bordering on or being in the navigable waters as defined in this section of the state by filling in or causing to be filled in or by draining or causing to be drained such waters the trustees of the internal improvement trust fund may, upon application therefor, convey to the riparian owner or owners of the upland so extended or added to, without consideration, so much of such extended or added land as is *772 not required exclusively for a municipal, county, state or public purpose. The trustees may, however, require a deposit to accompany such application of a sum sufficient to cover the actual cost and expenses of processing such application and preparing instruments of conveyance."
Accordingly, we hold that the chancellor committed error in adopting the position advanced by the plaintiff that such title as it retained to the upland (park strip) gave it a right of control over the adjacent lands which had been filled in by the defendant city for park purposes with state approval[5]; and we hold that the plaintiff made no showing to entitle it to the injunction.
The appellant's sixth point relates to dismissal of its counterclaim. The nature thereof was recited earlier in this opinion. The trial court was eminently correct in denying it. Olsen v. Puntervold, 5 Cir.1964, 338 F.2d 21, 22; 54 C.J.S. Malicious Prosecution, §§ 54a, 68.
The last point advanced by the appellant is a contention that the court erred in taxing the costs against the defendant city. As the plaintiff prevailed under the decree which was rendered, the court was not in error in charging costs against the losing party. Spencer v. Young, Fla. 1953, 63 So.2d 334; Blynn v. Hirsch, Fla. App. 1962, 136 So.2d 666. On remand it would be appropriate for the chancellor to reconsider the assessment of the costs as between the parties, in that the ultimate decision is only partly in favor of the plaintiff and is mainly in favor of the defendant City of Miami.
Having concluded the city was entitled to proceed to develop the filled in area adjacent to the park strip without control or interference by the plaintiff, even in absence of any easement in the park strip, we return to the contention of the city that its right to proceed to develop a park on the filled in area is further buttressed by its having acquired an easement in the park strip for the benefit of the public.
The rule generally applied is that upon the filing of a plat marking out streets and park areas, and the sale of lots thereunder, in addition to the creation, as between the subdivider and the lot purchasers, of private rights in the latter for their use of the streets and parks, there may be inferred an offer of public dedication which can be accepted by the municipality by instrument or by maintenance and public user within a reasonable time and prior to revocation. See Florida East Coast Ry. Co. v. Worley, 49 Fla. 297, 38 So. 618; Kirkland v. City of Tampa, 75 Fla. 271, 78 So. 17, 19; City of Miami v. Florida East Coast Ry. Co., supra, 79 Fla. 539, 84 So. 726, 730; City of Palmetto v. Katsch, 86 Fla. 506, 98 So. 352, 353.
When, as here, a plat recites the intention of the subdivider to dedicate the streets and park area to the lot owners but not to dedicate them to the public, it would appear that the rule referred to above is inapplicable, and that the initial intention of the subdivider as thus expressed operates to prevent the city from acquiring an easement for the benefit of the public in the platted streets or park area, regardless of subsequent events. In the final decree the chancellor held that the subdivider's intention as thus expressed in the plat had that effect. We can not agree, because subsequent action of the subdivider may be such as to override an expression of an intention at the outset not to dedicate to the public. This can be brought about by throwing such *773 streets and park areas open to the public, acquiescence in the improvement and maintenance of the facilities by the municipality and in use thereof by the public without objection by the subdivider or his successors or by the lot owners, acceptance of forebearance of the public body to tax the streets and park area, and in general by such action or inaction as to indicate an abandonment of the initial intention not to dedicate or offer to dedicate to the public, under circumstances from which an offer to so dedicate may reasonably be inferred, and, by such actions of the municipality, accepted.[6]
The facts disclosed in this case with reference to the maintenance by the City of Miami of the streets and park strip and public use thereof over much of the extensive period since the inception of the subdivision, all without objection by the subdivider or his successors or by the lot owners, in our opinion were sufficient from which to infer an offer of dedication and acceptance thereof by the City of Miami for the public.
By so ruling, based on the facts of this case, we do not purport to hold that when a plat is filed and recorded setting forth streets and other facilities such as park areas with an expression of intent by the owner or subdivider to dedicate such facilities for use of the lot owners but not to dedicate to the public, the latter intention will not be and continue to be effective where there is no apparent abandonment thereof and where there is objection by the subdivider or the lot owners to attempted municipal improvement, maintenance and public user thereof, or other action taken by them such as may evince a desire to adhere to the originally expressed intention not to dedicate or offer to dedicate to the public.
This holding that the City of Miami has obtained an easement in the park strip for public use thereof is an additional ground for reversal of the injunction against the City of Miami as contained in the decree, and also requires reversal of the ruling in the decree to the effect that the city is without right or interest in the park strip.
It is recognized in the law that an easement such as the city holds in the park strip for the benefit of the public may blend with the similar use easement in favor of the lot owners, and that the two can co-exist contemporaneously; and further that the city's easement in the park for the benefit of the public may not be exercised in a manner such as prejudice or unduly interfere with that of the lot owners. See Annot. 7 A.L.R.2d 607, 651 et seq. Moreover, we observe, as was the case in the trial court, that determination of the rights and standing of the plaintiff and the city with reference to the park strip, on consideration of the conflicting claims of those parties, necessarily has resulted in rulings bearing on the rights of the lot owners, who were not made parties to the litigation, and that such rulings are not to be considered as binding upon the lot owners.
We affirm the holding of the chancellor that the subdivider or successor to the subdivider holds legal title to the dedicated park strip, but we modify that holding to provide that the title remaining in the subdivider does not include the riparian rights (which were not reserved), and is subject to the easements in the lot owners and in the public.
We reverse the provisions of the decree relating to the adjacent lands filled in by the City of Miami, which hold or imply that the plaintiff corporation is possessed of rights thereto (based on holding legal title *774 to the park strip) superior to those of the City of Miami which are to construct and maintain a park thereon under the authority granted the city by the Trustees of the Internal Improvement Fund; and we reverse, as having been improvidently entered, the injunction restraining the city from proceeding to so improve and use the adjacent filled in land.
Accordingly, the decree appealed from is affirmed in part as modified, and is reversed in part, as and in the respects specified hereinabove.
NOTES
[1] PARK"
"WHEREAS Walter E. Flanders, and the Flanders Realty Company, a corporation under the laws of the State of Michigan, were former owners of certain property situated in Dade County, Florida, which has been platted under the name of Magnolia Park, and plat whereof has been recorded in the public records of Dade County, Florida, and
"WHEREAS, at the time of the preparation and recording of each of the said plats it was the intention that a strip of land bounded on the east by the channel of Biscayne Bay; on the north by North Drive, according to the second amended plat of Magnolia Park; on the south by an alleyway running from South Drive, according to the second amended plat of Magnolia Park, to Biscayne Bay, the south line of said alleyway being the north line of Lot 22 of said plat; and on the west by a certain street, not named, according to said plat, but which said street connects North Drive and South Drive, according to said second amended plat of Magnolia Park, the westerly line of said street being the easterly line of Lots B and C of said plat, be dedicated to the use of the lot owners of Magnolia Park as a part, and
"WHEREAS, such intention was not clearly carried out by said plats, and by dedications appended thereto:
"NOW, THEREFORE, Know All Men By These Presents, that we, the undersigned Walter E. Flanders and Hazel M. Flanders, his wife, and The Flanders Realty Company, a corporation under the laws of the State of Michigan, do hereby dedicate the said strip of land as it appears upon the second amended plat of Magnolia Park, now of record in Dade County, Florida, as and for a public park, for the use and benefit of the lot owners in said Magnolia Park, and for those who may hereafter be lot owners therein.
"IN WITNESS WHEREOF the said Walter E. Flanders and Hazel M. Flanders, his wife, have hereunto set their hands and seals, and The Flanders Realty Company, the corporation aforesaid, has caused these presents to be signed in its name by its proper officers, and its corporate seal to be hereunto affixed this 7th., day of October, A.D. 1919.
"Signed, sealed and delivered "Walter E. Flanders (SEAL)
in presence of: "Hazel M. Flanders (SEAL)
"Minnie V. Dobson "FLANDERS REALTY COMPANY
"Carl H. Pelton (Corp. Seal) " By Walter E. Flanders
 President."

[2] Metropolitan Dade County disclaimed interest, and by stipulation was dropped as a party defendant.
[3] The record discloses that subsequently the parties conceded the right which the State Road Department claimed and exercised for use of approximately 42 feet at the south end of the park strip, which was incorporated by the road department into a right of way leading from the then newly constructed Julia Tuttle Causeway to Northeast 38th Street. In view thereof the State Road Department filed no pleadings in the cause, and that south 41 or 42 feet was excepted in the description of the park strip in the final decree.
[4] The Second Amended Plat shows that the street which borders the park strip on the west (now known as Northeast Sixth Avenue) is 56.5 feet in width. The plat also shows that the park strip narrows from the south end to its north end, and that it appears to be approximately one half as wide at the north end as it is at its south end. Nevertheless, the metes and bounds description furnished in the complaint and used in the decree to describe the park strip represents it as being 9.16 feet in width at the south end and as having the same width throughout. At the final hearing it was conceded on behalf of the plaintiff that it was not intended to encroach on the street and that the plaintiff's claim of title to the park strip had reference to it as it appears on the plat, giving due allowance to the designated width of the bordering street. Also, the metes and bounds description of the park strip, as set out in the complaint and in the decree encroaches on North Drive. This is so because the metes and bounds description purports to carry the park strip across North Drive to the south side of Lot A, whereas it is plain from an inspection of the Second Amended Plat that the north end of the park strip is at the south or near edge of North Drive. The reference in the instrument confirming the dedication of the park strip (footnote #1) to the park as being bordered "on the north by North Drive, according to the Second Amended Plat" coupled with the further provision there that the dedication of the park strip is "as it appears upon the second amended plat of Magnolia Park," fixes the northern limit of the park strip at the south side of North Drive (now Northeast 39th Street).
[5] The state properly may grant an easement or authority to a state agency to fill in submerged lands and use them for a purpose and in a manner which is not such as to interfere with recognized common law rights of the upland owner. Here the use by the city of the filled in area as a park conforms to the use for which the upland park strip was dedicated. See Hayes v. Bowman, Fla. 1957, 91 So.2d 795; Duval Engineering and Construction Co. v. Sales, Fla. 1955, 77 So.2d 431.
[6] The absence of objection to public maintenance and public user of platted streets and park areas may be a basis for inferring intent to dedicate them to the public; and whether an offer of dedication to the public is to be inferred, as to streets and a park area marked out on a plat, is a matter to be determined upon a consideration of all of the relevant circumstances. City of Palmetto v. Katsch, 86 Fla. 506, 98 So. 352, 353.